## LOS ANGELES & S. L. R. CO v. PUBLIC UTILITIES COMMISSION et al.

No. 5286. Decided December 28, 1932. (17 P. [2d] 287.)

*Geo. H. Smith, R. B. Porter, W. Hal Farr,* and *L. H. Anderson,* all of Salt Lake City, for plaintiff.

*Geo. P. Parker,* Atty. Gen., and *Byron D. Anderson,* Deputy Atty. Gen., for defendants.

WOLFE, District Judge.

The petition sued out a writ of certiorari to have reviewed a decision of the Public Utilities Commission denying an application to discontinue the operation of Faust on its main line in Tooele county, Utah, as an agency station, and also to have reviewed an order denying a petition for rehearing. The record consists of testimony offered by the railroad on the one hand and by objecting farmers on the other. No objections by live stock raisers, as was the case of the application for the discontinuance of St. John as an agency station, were made, although the evidence shows that there were in and out bound shipments of sheep to and from Faust, mostly range to range movements. The record of carload shipments forwarded and received during the years of 1929, 1930, and eight months of 1931 showed that the great bulk of these carload shipments took place during several months of the year only. In 1930 the carload freight fell off considerably from 1929. During that year there was forwarded 6 carloads during January, 3 during February, 1 during March, 13 during April, 1 during May, 20 during June, 3 during July, 1 during August, 1 during September, 5 during October, 8 during November, and 2 during December, a total of 64 cars forwarded. Carload lots received during the same year were, 1 during January, 3 during February, none dur-

ing March, April, May, June, July, August, and September; 1 during November, 4 during December, a total of 9, or a total of forwarded and received during 1930 of 73 carload lots as against 285 carload lots forwarded and received during 1929. The main bulk of carload lots forwarded and received from Faust station during 1929 were during the months of March, April, May, June, and October. During 1930 the bulk of carload lots forwarded and received were during the months of April and June. During the eight months of 1931 there were 14 carload lots forwarded in June, 1 for the month of March, April, July, and August respectively, 6 for January, and none for February and May. Carload lots received were, 1 for February weighing nine tons; none for any of the other eight months. It can thus be seen that the bulk of the shipments occurs within four or five months of the year if we take the experience of three years. During the eight months of 1931 there were only 25 cars forwarded and received showing the marked decrease in business. Probably the great majority of these carloads were range to range shipments of sheep.

The system revenue derived from carload lots forwarded and received at Faust amounted in 1929 to $13,395 in round figures. In 1930 it was $5,169. During eight months of 1931 it was $1,993. The falling off of revenue during the years 1930 and 1931 as compared with 1929 was therefore very marked. The system passenger revenue accruing to Faust for 1929 was $262.77; for 1930, $172.95; for the eight months of 1931, $58.10. Freight revenue for less than carload lots forwarded and received during 1929 was $587; during 1930 it was $255; during the eight months of 1931 it was $130. There were other miscellaneous revenues, including revenues from Western Union business, which amounted to $412.33 in 1929; $176.66 in 1930; $78.62 during the eight months of 1931. The agent's pay in 1929 was $2,603.75; in 1930, $2,105.37, and $1,319.78 for the eight months of 1931. If the agent's wages for twelve months of 1931 was in the same proportion as for the eight-month

prior and revenue was also in the same proportion for the twelve months for all passenger, carload lots, less than carload lots and miscellaneous revenues, system revenue for the full year chargeable to Faust station would be $3,387 and the cost of the agent $1,978. The agent's salary would, in other words, be more than one-half of the revenues for all passenger traffic and freight received and forwarded from Faust and all miscellaneous revenue. The revenue could not be considered as having been earned at Faust. It would be contributed to by many services rendered over the whole system. There were some other costs at the Faust station besides the agent's salary which we have not taken into consideration on the theory that the discontinuance of the agency would not affect a saving in these items, such as maintenance, miscellaneous station supplies, coal and stationery, although it would, perhaps, require less coal if there were no one in the station a good part of the time, and less, if any, stationery; maintenance and miscellaneous station supplies might be practically the same.

The petitioner contends that the high cost of the agent as compared to the revenues credited to the station require the commission, as a matter of law, to grant the petition for discontinuance of the agent. In the case of the *Los Angeles & Salt Lake R. Co.* v. *Public Utilities Com. of Utah et al.,* 15 P. (2d) 385, hereinafter called the St. John Station Case, we considered at length the effect of the cost revenue factor in the matter of an application to discontinue an agency. We held there that the amount of the revenue which can be credited to a station compared to the station expenses is one but not the sole controlling factor in determining the nature, type, character, and extent of the services or facilities to be provided; that there must be some rough relationship between the amount of service and the revenue; that there might be rare cases where the agency service would have to be continued in order to give the just and reasonable service required by the statute, even though the cost was more than the revenues derived. For a discussion of these

principles, the reader is referred to that case. The part of the statutes which specifically governs in this case, as in the St. John Case, is subsection 2, § 4783, Comp. Laws Utah 1917, reading, as far as material in this case:

"Every public utility shall furnish, provide, and maintain such service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, and convenience of its patrons * * * and the public, and as shall be in all respects adequate, efficient, just and reasonable."

And section 4834, which provides in part as follows:

"* * * The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of Utah. The findings and conclusions of the commissions on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. * * *"

In the St. John Station Case we considered at length the scope of the inquiry which this court could entertain in a case of certiorari from the commission under section 4834. We held that we had no authority to determine from our own judgment whether, under the evidence, the agency should be discontinued, and thus put ourselves in the place of the commission, but we must determine whether any reasonable mind could come to the same judgment as the commission came to on the evidence controlled by the principles of law discussed in that opinion. If there is any evidence upon which any reasonable judging mind could come to the same conclusion that the commission came to, it would be our duty to affirm the decision of the commission. How stands the matter in view of such test? We have already given the figures as to the revenue chargeable to Faust station during the years 1929, 1930, and eight months of 1931, and the cost of maintaining the agency.

The railroad further introduced evidence that the average cost of station maintenance over the entire line was 3.65 of every dollar of gross revenue. In the St. John Station Case we uncovered the fallacy of this ratio as a criterion to be applied to all stations, pointing out that it would not be of service as an argument to impel the commission to permit such a discontinuance of agency service when the cost-revenue factor did not conform to such average. In this case, however, as pointed out before, the station expenses for 1931, based on the figures for eight months of that year (exclusive of coal, stationery, general maintenance charges and supplies), were $1,978, or nearly 60 per cent of the $3,387 of gross revenue credited from all sources. But, as stated in the St. John Station Case, the fact that there was a high percentage of station costs to revenue would not alone be sufficient to justify the discontinuance of the agency. The question raised in that case, as in this case, was whether the service to be provided when the agency was discontinued would be adequate, efficient, just, and reasonable, as required by subsection 2 of section 4783, Comp. Laws Utah 1917, in view of the cost revenue factor, and the question for this court would be whether any reasonable mind could have found, under the evidence of this case, that it was necessary to continue the agency in order to give such services. Let us examine the evidence from that standpoint. The railroad maintained that a shipper of less than carload lots could be served with slight inconvenience by leaving the freight in a storehouse which would have two locks, the key to one to be in the hands of some responsible person, the key to the other to be in the hands of the signal maintainer and the section foreman, both of whom reside at Faust. The bills of lading would be placed in the waybill pocket located outside of the building. The local freight conductor would look in the box, obtain the bills of lading, unlock the door, and load the freight, sign the bills of lading, replace them in the waybill box where the shipper would regain them and send them to the consignee. Unless the

shipper is present when the local freight conductor arrived, he would be required to make one trip to deliver the freight to the storehouse and another to regain the bills of lading. If there were an agent, he would only be compelled to make one trip instead of two. This is the only difference, as far as we can see, in the case of less than carload lots forwarded. When less than carload lots of freight arrived, as distinguished from those to be forwarded, they would be placed by the conductor in the storehouse under lock and notification sent by the next recording station agency to the consignee who would call for it. The freight received would have to be prepaid. In such case there would be no extra trip on the part of the consignee, as he would have to come for the freight whether the agent was there or not; the only difference being that he would be notified, not by an agent at Faust, but by an agent at some other station.

In view of the very small amount of revenue derived from less than carload lots forwarded and received, and in view of the comparatively small inconvenience attached to the handling of such freight without an agent as compared with that which would not have to be suffered were there an agent present, we do not believe that any reasonable mind can say that an agent should be kept at Faust for the purpose of handling less than carload lots forwarded and received; nor do we believe, under the evidence, in view of the small passenger revenue from passengers arriving at or leaving Faust station, could it be said that any reasonable mind could justify the continuance of the agency for taking care of the passenger business. We now come to consider the services which would be given in the absence of an agent in case of carload lots forwarded and received as compared with that given in relation to such services by a resident agent. The method proposed by the railroad for handling carload lots was as follows: On carload lots received the freight would have to be prepaid. The agent at the next reporting station would send notification through the mail of the arrival of the car at Faust, and the consignee would

come and unload. This is no less than an agent at Faust would do. When carload lots were to be forwarded from Faust, the shipper desiring to load would order his car by mail or telephone from any agent or from any conductor or through the section foreman or signal maintainer. These later would give the information by telephone to the chief train dispatcher at Salt Lake, who would cause the car to be "spotted." The shipper would load it out, place the bill of lading in the waybill pocket as in the case of less than carload lots, and, when the car was picked up, the conductor would sign the bill of lading, replace it in the box wherein the shipper would regain it, and send it to the consignee. It was complained that this would require two trips, one to load the car and one to regain the signed bill of lading, unless the shipper waited for the conductor to arrive at the station. But it appeared that all the protestant shippers shipped from Dunbar, a station seven miles west of Faust, and not from Faust, and were in the habit of going to Faust to get the agent there to receipt for the loaded car and make out and sign the bill of lading. This practice, however, is irregular, because the agent has no right to receipt before the car is picked up. Further, in such case it would be necessary to make the trip to Dunbar to load and then a trip from Dunbar to Faust in order to obtain the signature of the agent at Faust to the bill of lading. The question as to whether this one trip to Dunbar and another trip from Dunbar to Faust or from Vernon to Faust was any more inconvenient than two trips to Dunbar does not specifically appear, but, if it were less convenient, it would seem to be very little so. And, if the practice of having the agent at Faust receipt for freight set out at Dunbar before the car was picked up should be discontinued by the railroad, then of course the shippers at Dunbar would have to go through exactly the same procedure at Dunbar as they would be expected to go through if they shipped from Faust without an agent, because Dunbar is a nonagency station, and whether or not there is an agency at Faust would make no

difference to them. A Mr. Pearson testified to an incident in which it was necessary to obtain information as to lighting a heater in a box car to prevent freezing of seed potatoes where it transpired that he telephoned the dispatcher who informed him that he was infringing upon the rules. We cite it because it reveals the real attitude of the shipper. He further testified: "Now, if we could in some way use the telephone at Dunbar to call Faust or other stations where there might be an agent that would help us considerably, but we don't want to use the phone and be humiliated by infringing on, or told that, as long as we are giving business to your company."

The conclusion is inescapable from the evidence that, if a telephone were installed at Faust and possibly at Dunbar, those who were in the habit of going to Faust in order to obtain cars from the agent there to ship from Dunbar, and then of going there again to have their bills of lading signed, they could obtain cars practically as well by the telephone as through the agent at Faust; and for the purpose of regaining the signed bill of lading after the car was picked up, if indeed they did not contact with the conductor, it would be but little more inconvenient, if any, to return to Dunbar for the bill of lading than it would be to go to Faust. Consequently as to those shippers who used Dunbar as a shipping point discontinuance of the agency would not affect them materially if a telephone were installed at Faust. And, if a telephone were also installed at Dunbar, it would seem they would gain convenience by the change.

As stated before, while there were no protesting live stock growers—the protestants being carload shippers of agricultural products, calcite and clay—it did appear from the evidence that there were range to range shipments of sheep from Faust. An incidental question arises as to whether the commission in this case could take into account the evidence which was adduced in the St. John Station Case regarding the shipping of sheep and the inci-

dents attendant thereto. St. John station is 12.8 miles east of Faust. The physical conditions at both stations are practically the same. It is semidesert country. But no evidence was introduced in the Faust case concerning any inconvenience to shippers of like stock from or to Faust. Can the commission take into consideration the knowledge that it received at the hearing in the St. John Station Case as to the methods, practices, and incidents attendant to the shipping of live stock to and from St. John and apply it to this case because the two stations exist under essentially similar physical conditions and serve communities engaged in similar pursuits and living under similar conditions? Naturally, if shippers of live stock to and from St. John would have certain difficulties or inconveniences regarding the forwarding or receiving of carload lots of sheep, it would not take a very great imagination to conceive that shippers of sheep patronizing a station 12.8 miles west situated under essentially the same conditions would have the same difficulties. But can the commission consider such fact without specific evidence introduced in this case? If the two hearings had been consolidated, there would have been no question. But there were separate applications to the commission, separate hearings were had, so consequently they constitute separate cases. The evidence adduced in the St. John Station Case in this regard cannot be considered as evidence adduced in this case. While the same counsel for the railroad may have appeared in both cases, and the same witnesses testified for the railroad in both cases, a fact which we would have to confirm by going outside of this record and consulting the St. John Station Case record, yet the cross-examination which the railroad counsel might direct in the Faust case to the witnesses who appeared in the St. John Case, if they appeared in the Faust case, might vary materially because of the new witnesses who appeared in the Faust case. The commission, like a jury, can consider such facts in relation to evidence adduced which constitute the common facts of life and which form the common knowledge of mankind and can

take judicial knowledge of such facts as a court may take judicial notice of. Such facts permit the fact finder to interpret evidence and articulate it to the general facts of life. The commission may also, perhaps, take judicial notice of such facts and practices as are generally known throughout the whole field of railroad transportation; that is, such facts which are practically universal among operatives in the field to which the jurisdiction of the commission extends, although they may not be known to the world generally, but it cannot take its special knowledge which it may have gained from experience or from other hearings and base any findings or conclusions upon such knowledge. That is fundamental. In *Atchison, T. & S. F. Ry. Co.* v. *Commerce Commission,* 335 Ill. 624, 167 N. E. 831, page 837, it was held:

"The commissioners cannot act on their own information. Their findings must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such."

See, also, *United States* v. *Abilene & Southern Ry. Co.,* 265 U. S. 274, page 289, 44 S. Ct. 565, 68 L. Ed. 1016, also *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299, page 312, 47 S. Ct. 413, 415, 71 L. Ed. 651, where it was held that

"data collected by the Commission as a part of its function of investigation constitute ordinarily evidence sufficient to support an order, if the *data are duly made part of the record in the case in which the order is entered.*" (Italics ours.)

This case therefore must stand upon the evidence actually introduced in the case. From the evidence so introduced we are forced to the conclusion that, in view of the high cost of maintenance of an agency at Faust as compared with the present system revenue credited to the Faust station, and in view of the services which could be

given if telephones were installed at Dunbar and Faust stations accessible to patrons of the road, the commission erred in not holding that such services would be adequate, efficient, just, and reasonable. We can say in that case what we could not say in the St. John Case that by all reasonable judgment, under the evidence of this case, such substituted services would be adequate and reasonable in view of the high cost of maintaining an agent as compared with the revenue chargeable to the Faust station. In fact, the only evidence of any inconvenience which would be suffered by taking away the agent at Faust would be to shippers who used the Dunbar station and they would only be inconvenienced, if at all, because they would not be able to continue the practice of having the agent at Faust sign the bills of lading before the cars were picked up, which practice was irregular and might be stopped by the railroad. We must therefore conclude that there is no substantial evidence to support the conclusion contained in paragraph 8 of the findings of the commission that "there is great public need for the services of an agent there, more especially in view of the fact that the station at Dunbar is also dependent upon Faust for its agency service," and consequently no evidence to support its decision denying the application. We assume that the commission took into consideration, in denying the petition for rehearing, the offer of the railroad company to install a telephone at Faust. We are making what would appear to be the reasonable assumption that the commission, in denying the petition for rehearing, considered the effect which the installation of a telephone at Faust, and perhaps at Dunbar, would have, upon the services furnished under such conditions to the shippers at Dunbar and Faust, and that it still considered the services which would be furnished by the railroad by the installation of those telephones as being unreasonable and inadequate. As we pointed out in the St. John Station Case, the proffer to install a telephone must either be considered as having come in the original application for the discontinuance of the agency and the de-

cision of the commission in denying the petition for rehearing be considered as tantamount to a decision denying the original application with that proffer contained in it or it must be considered that the commission determined that the offer to install the telephone could not be considered in any case because it came too late. Under either theory, however, the decision of the commission would have to be set aside. If we consider the denial of the petition for rehearing as equivalent to a denial of the application for the discontinuance of the agency with the proffer of the installation of a telephone included in said original application, then the decision denying the said application would have to be set aside. If, on the other hand, we consider that the commission took the view that it would not consider the question of whether the services would be adequate and reasonable with a telephone installed because the offer came too late, then, as stated in the St. John Station Case, we believe the commission erred in not granting the petition for rehearing because such view would have been erroneous. The upshot of the matter is that we decide that, as a matter of law, the commission should have found that, with the installation of telephones at Dunbar and Faust, the shippers who had formerly depended upon the Faust station, whether shippers from Dunbar or from Faust, would be adequately, efficiently, and reasonably served in compliance with the requirements of subsection 2, § 4783, Comp. Laws Utah 1917. In accordance with the power given this court by section 4834, Comp. Laws Utah 1917, judgment is hereby entered setting aside the decision of the commission denying the application and the decision of the commission denying the rehearing.

STRAUP, ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J., did not participate herein.