McCARTHY et al. v. PUBLIC SERVICE COMMISSION OF UTAH et al.

No. 5830. Decided March 12, 1938. (77 P. [2d] 331.)

Rehearing Denied May 11, 1938.

*Van Cott, Riter & Farnsworth, George H. Smith, Robert
B. Porter, W. Hal Farr, F. M. Orem, Irvine, Skeen & Thurman,* and *Lynn S. Richards,* all of Salt Lake City, and
*DeVine, Howell & Stine,* of Ogden, for plaintiffs.

*Joseph Chez,* Atty. Gen., *John D. Rice,* Asst. Atty. Gen.,
and *Irwin Clawson, H. B. Maw, Benjamin Spence,* and
*D. N. Straup,* all of Salt Lake City, for defendants.

HANSON, Justice.

Certiorari to review and annul an order of the Public
Service Commission of Utah (herein styled the Commission), granting to the defendants Sims, doing business as
Salt Lake Transfer Company (herein styled the Company),
a permit to operate as a contract motor carrier of property
over the public highways of this state.

The law applicable to the controlling facts, and not the
facts themselves, is in dispute. The plaintiffs, twelve in
number, are common carriers of property and passengers
over private lines of railroad or the public highways of
the state, operating under certificates of convenience and
necessity. On April 3, 1936, the Commission issued to the
Company on its application a permit, No. 125, to operate
motor vehicles as a "contract motor carrier" of property
over all the highways of Utah. No notice of the application
was given to either the plaintiffs or other carriers, or anyone; no hearing was had; no evidence was introduced or
made part of the record or proceedings in granting the
permit. But the Commission, nevertheless, made findings
of fact, inter alia, that the Company is a contract motor
carrier within the first paragraph of section 9, c. 65, Laws
of Utah 1935, and as defined in section 1 of that act; that
legal proof of these facts had been submitted by the Company. Defendants, however, rely upon certain official records and reports not put in evidence or made part of the
record or proceedings in support of the findings and order
granting the permit. Prior to the issuance of the permit,

to wit, in September, 1934, in case No. 1544, the Commission, in a hearing or ruling upon a former application of the Company for a permit to operate as a contract motor carrier of property, had found and decided that the Company was not a contract carrier, but was and for many years had been a common carrier of property; hence, denied its application as a contract carrier. The defendants admit this to be true, but say that the action so taken was later vacated and set aside and the application dismissed.

After the issuance of the permit No. 125, plaintiffs, desiring to oppose the same, filed with the Commission their petitions for a rehearing and reconsideration of the action so taken, praying that the permit be vacated or denied. From the Commission's denial of their petitions, plaintiffs seek review in this court.

So much of chapter 65, Laws of Utah 1935, as is material we quote:

Section 1. "'Common Motor Carrier of Property' means any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle from place to place, the property of others who may choose to employ him. * * *

"'Contract Motor Carrier of Property' means any person engaged in the transportation by motor vehicle of property for hire and not included in the term common motor carrier of property as hereinbefore defined."

Section 6 of the act makes it unlawful for any common motor carrier to operate in intrastate commerce without having obtained from the Commission a certificate of convenience and necessity, which shall not be issued until a hearing is had after ten days' notice to every common carrier then operating or who has applied for a certificate to operate in the territory to be served by the applicant, and to other interested parties, all of whom are deemed parties in interest and may offer testimony for or against the application. A showing of financial ability, condition of the highway, and as to existing facilities to serve the public

is required.  The Commission may grant or refuse the certificate for which application is made.

Section 9. "It shall be unlawful for any contract motor carrier to operate as a carrier in intrastate commerce without having first obtained from the commission a permit therefor.  The commission shall grant on application to any applicant who was a contract motor carrier as defined by this act on the 15th day of March, 1933, a permit to operate as a contract motor carrier on the same highways and to carry on the same type of motor service as he was prior to said date.

"Where said applicants were operating on all the highways of the state prior to said date, the permit shall authorize them to continue to operate on all of said highways.

"The commission shall furthermore grant on application to any applicant who received a permit to operate as a contract motor carrier between the fifteenth day of March, 1933, and the date on which this act takes effect, a permit to continue to operate in the same manner and over the same highways as the terms of said permit allowed.

"The commission upon the filing of an application for a contract motor carrier's permit by any other person than those referred to above in this section shall fix a time and place for hearing thereon and shall give the same notice as provided in section 6 hereof."

Further provision is made in said section 9 that the Commission shall subpoena on such hearing a member of the State Road Commission to attend the hearing to produce testimony as to the character of the highway, public interest, etc., and the Commission may on the showing made, in its discretion, grant or refuse the permit applied for, subject to court review if invoked by the applicant.

Section 11. "The commission shall have power, without a hearing, to issue temporary, seasonal or emergency permits to contract motor carriers in intrastate commerce.  *  *  *  Such permits and licenses may be issued upon such information, application or request therefor, as the commission may prescribe.  *  *  *  But in no event  *  *  * for a period of time greater than sixty days."

Section 13. "No portion of this act shall apply:  *  *  *

"(i)  To the casual or occasional transportation of persons or property for compensation by any person not regularly engaged in transportation by motor vehicles as his or its principal occupation or business."

Plaintiffs complain that they were, by lack of notice to them, deprived of an opportunity to controvert the facts found by the Commission and to oppose the granting of the permit in question. They contend that the first part of section 9, above quoted, properly interpreted, requires the Commission, before issuing a permit thereunder, to determine whether the applicant was in fact a contract motor carrier, as defined by section 1, on March 15, 1933, and to make a finding thereof upon evidence at a hearing, of which plaintiffs were entitled to notice and an opportunity to appear and be heard. But if section 9 be otherwise construed or applied, it is unconstitutional and void for conflict with section 1 of the Fourteenth Amendment of the Constitution of the United States, and with sections 1 and 24, art. 1, of the Constitution of Utah.

Defendants demur to the petition for review for insufficient facts, and contend further that plaintiffs were not parties to the proceedings before the Commission and do not show that the order complained of was directed against them, or that they have suffered any special, immediate or direct injury by reason thereof.

Section 104-67-3, R. S. Utah 1933, provides that application for the writ of certiorari must be made upon affidavit by the "party beneficially interested." Similar wording in the statutes of California and Montana is construed in those states to include persons who have a special or peculiar interest, though not a party of record to an action where not litigated inter partes. *Burlingame* v. *Justice's Court,* 1 Cal. 2d 71, 33 P. 2d 669; *State ex rel. Johnston* v. *District Court,* 93 Mont. 439, 19 P. 2d 220. And see *State* v. *Chittenden,* 127 Wis. 468, 107 N. W. 500, 509; *Clary* v. *Hoagland,* 5 Cal. 476, 478; *People* v. *Andrews,* 52 N. Y. 445; *State* v. *Rose,* 4 N. D. 319, 58 N. W. 514, 26 L. R. A. 593.

This definition of beneficial interest is in harmony with the Utah case of *Startup* v. *Harmon,* 59 Utah 329, 203 P. 637, to the point that a party in interest must have such

an interest as is separate and distinct from that of the community in general. An analogous case to the present one is that of *People ex rel. New York Edison Co.* v. *Willcox,* 207 N. Y. 86, 100 N. E. 705, 45 L. R. A., N. S. 629. See, also, *Electrical Products Corporation* v. *Second Jud. Dist. Court,* 55 Nev. 8, 23 P. 2d 501; 4 Cal. Jur. 1085, § 49.

Section 6 and part of section 9 of the act are strongly indicative, if not decisive, of the legislative intent and meaning on this point, in the requirement of notice to and hearing of every competing carrier before a certificate of necessity or a permit is issued to an applicant. True, the first part of section 9 directs the issuance of permits "upon application" to applicants previously operating as contract carriers. However, this is not decisive that competing carriers are not entitled to a hearing even in such cases, since the Commission would hardly feel called upon to issue a permit in any case except upon application by the party desiring it— and whether such party had before operated or enjoyed a permit or not.

True it is, also, that in the later clause of said section 9, dealing with applications by other persons than the two classes first specified, there is an express direction that the Commission shall fix a time and place for a hearing thereon and give notice in like manner as provided in section 6 of the act relating to common motor carriers. But in the case of the two excepted or specified classes of applicants no such notice is enjoined, neither is there an express prohibition of such notice or hearing. But this does not negative the conception that a competitor has an interest in any action that may be taken upon an application for a permit within either of the two specified classes, which he may assert upon proper application to become or be made a party to the record or proceeding. Even under general Code procedure it is not the uniform, unvarying practice to join as a party plaintiff or defendant every party having an interest in the subject matter or in granting or opposing the relief sought. There is the distinction

between proper and necessary or indispensable parties. Thus, in actions to quiet title the plaintiff may join all or as many persons claiming adversely as he chooses and make them parties defendant. And the judgment will settle matters only as between those actually joined and served with process. In creditors' suits and in numerous other actions by stockholders, creditors, heirs, or others, the plaintiff may join all or as many as he deems necessary or judicious in view of the nature of the relief he seeks and the ends in view. It is not always essential to jurisdiction that every party in interest be joined on the record at the outset.

The Code provisions do not govern procedure before public quasi-judicial bodies, such as the Public Service Commission, the Industrial Commission, or the like. But the principles of Code procedure have been reflected in the procedure of these special tribunals. Thus, in *Southern Surety Co.* v. *Arter,* Tex. Com. App., 44 S. W. ■ 2d 913, 916, it was ruled (in strict analogy to Code procedure) that while a party beneficially interested in the result of a decision of the Industrial Accident Board, who had neglected to intervene and be made a party of record before the board, could not maintain statutory court proceedings for review of the decision, yet that such party "had the legal right to intervene before the Industrial Accident Board and thus make itself a party to the proceeding in which the defendant in error claimed compensation from the Southern Surety Company. If it had done so it would have been in position, as a 'party interested,' to have prosecuted its appeal from any award adverse to its interests."

And in the recent case in this court, *Ellis* v. *Industrial Commission,* 91 Utah 432, 64 P. 2d 363, 364, an interested party, not a party to the record or proceedings before the Industrial Commission in which the order or decision complained of was made, intervened therein after the decision by petition for a hearing and reconsideration. The Commission granted the petition, set a day for hearing, heard evidence, and rendered a decision, from which the inter-

vener maintained certiorari and had a review in this court. The case is directly in point here where the plaintiffs have proceeded in like manner before the Public Service Commission, although their petition for a hearing was denied by that body. By their petition, plaintiffs made themselves parties to the record before the Commission, and if parties in interest they may have review.

Defendants contend that plaintiffs have no special, direct, or immediate interest in the proceeding or decision complained of and are not injured thereby, since they still may seek and obtain all the transportation business they can get, the same after as before the decision of which complaint is made. We cannot assent to this view. The plaintiffs have a special interest in opposing the defendant Company's application for a permit in excess of and different from the interest of the community in general. In quality, plaintiffs' interest in opposing the application is exactly the same as that of the Company in maintaining it, namely, the effect thereof upon their prospect for earning money in their business. The available supply of business over a given route or over all routes covered by their common facilities is the source from which the earnings of each carrier must come. Whatever subtracts from the total volume of business is a diminution of earning capacity for those who must compete for and share in the remainder and who have equipped themselves at large expense for carrying a larger share of the business. True, no carrier has a property interest in any specific business or shipment until he actually gets it, connects with it, appropriates it, by contracting therefor with the shipper. But he is entitled to his chance as a competitor at all the business there is as against anyone proceeding unlawfully or without due authorization of the statute to divert or appropriate any part of it. The rights of competing carriers to share in a stream of transportation business flowing over a given route or highway may well be likened to the rights of rival or competing appropriators of water from a natural stream or source of supply, where there is insufficient water

in the source to fully satisfy the wants or needs of all. In such case, every appropriator or user of water has a beneficial interest in protecting the supply of water in the natural stream from unlawful diminution, even before it reaches his own headgate and before he has made any specific water in the stream his own. And he is entitled to his day in court or a hearing before the official charged with policing the stream and distributing the water of the stream, to protest against any unlawful act of wastage or distribution of the water.

Recurring now to the first part of section 9 of the act, it will be noticed that provision is made for the granting of permits by the Commission "upon application" to two classes of persons, without expressly enjoining notice and a hearing before granting such permits, namely, (a) to those who were contract carriers as defined by the act on March 15, 1933, and (b) to those who have received a permit as contract carrier after March 15, 1933, and before the effective date of the act. In neither class is there any distinction made by the section between the different classes of contract carriers and permittees into which the other sections of the act classify them. It matters not, under section 9, whether the applicant was a contract carrier before March 15, 1933, on all the highways of the state, a portion thereof, or only over a small portion of one highway; or, whether the applicant was a constant carrier or only an intermittent or occasional, casual, or seasonal carrier, as defined in sections 11 and 13 of the act. If the applicant was a contract carrier in either of these ways "on the 15th day of March, 1933," the Commission could issue to him a permit for the continuance of the same character of service or over the same highways and for the same type of motor vehicle as he was engaged in or furnishing prior to that date. Or, on the other hand, if the applicant had never done any contract work at all before March 15, 1933, but had done some such work under a permit from the Commission after that date and before the effective date of the

act, whether continuous or occasional and casual it does not matter, such applicant also could have a new permit to operate in like capacity "upon application" after the act became effective. But, it was next further provided that the Commission, upon the filing of an application by any other contract motor carrier than those in the two classes above referred to, to wit, by newcomers in the contract motor carrier business, shall fix a time and place for hearing and give notice to all adversely interested in the same manner as required by section 6 of the act relating to competing common motor carriers.

Why this difference in the procedure prescribed by the act as between applicants who had rendered prior service, regular or intermittent, before the effective date of the act, and those who had not rendered prior service but who would seek such employment after the act became effective? It must have been that the Legislature, in preparation for and in framing the act of 1935, paused and took stock of the existing situation—made a survey of the condition of the highways of the state and of the constituent factors entering into any amendment proposed to the existing legislation. These would include an estimate of the number, character, and capacity of existing carriers, common and contract, to render adequate service to the public; and whether the increasing number of carriers, actual or probable, might call for regulation or restriction in the public interest. The Legislature doubtless concluded that while the number of contract carriers, and the size, weight, or character of their vehicles then in operation, may not have been redundant or seriously hurtful to the highways, or injurious to the public in the matter of rates charged to sustain them all in operation, yet any substantial increase in their number, size, weight, load haulage, etc., might injuriously affect the public interest not only in the cost of highway maintenance but in the matter of rates charged to meet the cost of purchase, repair, maintenance, replacements, and operation. The tendency to increased size, weight, tonnage, etc., of

some of the more recent vehicles coming into use held a threat to the public interest in both directions and necessitated regulation. These were chiefly owned by the larger companies engaged in common motor carrier service. Their operation was prohibited except under certificates of convenience and necessity, to be determined by the Commission upon a hearing on each application, after notice to competitors and others interested.

Looking then to the next largest and more or less continuous users of the highways, contract motor carriers came in for consideration. These, considering their number, size, and character of vehicles in use, we must presume the Legislature to have concluded, held no immediate threat to the public interest unless their number, size and burden of operation, charges, etc., should be increased thereafter. Hence, it was enacted by section 9 that such contract carriers, regularly or intermittently, or casually employed prior to the passage of the act, might be permitted to continue the same character and type of motor vehicular service and on the same highways as they or any of them had previously had in service before the effective date of the act. To these the Commission might issue a permit upon application and without specific direction for a hearing or notice of hearing to others concerned. A hearing might or might not be ordered by the Commission, either upon its own motion, or on request of the applicant. In the case of casual, occasional, seasonal, or trip applications, many of them might be defeated or rendered abortive by the very fact of the delay necessary to grant a hearing after notice to others. The occasion for the specific service for which a permit was asked might pass by and find its destination by other conveyance, or perishable loads might decay before regular facilities became available. Hence, a permit might be issued without notice in such cases. The Commission must judge as to the exigency and urgency involved, and so might act without delay, hearing, or notice. The Commission was restricted, however, by the act, to the issuance

of such permits as would replace an existing service at the date of the act, or a service being rendered theretofore or before March 15, 1933, of the same class or character. All subsequent applicants who had not rendered prior service, and who might represent an increased burden on the highways, or threaten an increase in rates, must await a hearing and notice to existing carriers before entering the field and before obtaining a permit therefor.

But it was never intended by the Legislature that these permits issued under the act to existing or antecedent contract carriers without a hearing or notice to others should be conclusive and binding determinations of the right of such permittees to operate thereunder, or to perform any other or different service than specified therein, or even the class of service therein stated. In the nature of the case, such permits can only operate as prima facie evidence of the right of the permittee to operate thereunder. Least of all can it be properly said that such a permit, issued upon application, excludes the right of a competitor to contend and to show to the Commission by protest, objection, or otherwise that the permittee in his operations thereunder has exceeded the limits or character of service permitted thereby, and has entered into regular competition with—let us say—common motor carriers; that the permittee is holding himself out to the public as equipped, ready, and willing to accept loads wherever and by whomsoever tendered; or that he has provided himself with equipment for use in hauling loads that unduly injure the highway, the public, and all competitors; or that he is hauling regularly over highways not specified in his permit. These and many like subjects of inquiry might be suggested. In any such case it would be the Commission's duty to receive and file the complaints or objections made and to order a hearing to determine the truth of the matter, notwithstanding that a permit had already issued to the contract carrier in question. This is not unfair to the latter, for, had the permittee desired a permit or a certificate of

necessity that would be conclusive and binding upon all comers, he had it in his power to request a hearing of the Commission and notice to all adversely concerned before the issuance or acceptance of the permit. Upon constitutional principles the applicant cannot expect a conclusive or binding determination upon an ex parte application. Least of all, can he expect that persons adversely affected by his application shall be held bound or affected by mere self-serving declarations or statements contained in his application for a permit.

Views in some respects similar to the foregoing were held by the Supreme Court of Virginia with respect to a similar statute of that state, distinguishing between carriers who were such prior to the act and those desiring to enter the field afterward. See *Gruber* v. *Commonwealth*, 140 Va. 312, 125 S. E. 427. Such a view is none the less sound because of the fact, as here asserted, that the applicant had an established business as a contract carrier at and long prior to the date of the passage of the regulatory act. *Collins* v. *Texas*, 223 U. S. 288, 297, 32 S. Ct. 286, 56 L. Ed. 439. Or, if an applicant has not an established business but seeks to acquire one through recurrent applications and permits, he is none the less amenable to regulation. For the Legislature may prohibit or regulate, in the public interest, either a general practice or a single transaction of a kind that is not likely to occur otherwise than as an instance of a general practice. *Collins* v. *Texas*, supra.

Every such permit, every act of transportation, tends to produce competition for business, and increased activity to get and control business. But competition is not, in itself and always, a benefit to the public or in the public interest; not any more than is monopoly always in the public interest. Rather, it lies in a medium between the two. As well said in a recent case, *People's Transit Co.* v. *Henshaw*, 8 Cir., 20 F. 2d 87, at page 90:

"The results of such competition, where there is not sufficient business to sustain all of the competitors, is that a season of experience causes all or some to drop out or compels the purchase of competitors (usually at exaggerated amounts), thus causing an increase of capital expenditure of the purchasers upon which the charges to the public must be based and thereby increased.

"These considerations, and others, amply justify differences to protect and preserve the existing permanent system. No new system has a legal right to destroy such existing system and have the public at its mercy. The public welfare is not served, but harmed thereby. The public may protect itself against such results. Nor can any theory of free competition change this situation. Competition is recognized and encouraged for the sole reason that it is supposed to result in the public good. But competition is not necessarily unrestrainable. It cannot be allowed to harm the very public it was designed to protect and aid. It may be restrained for the public welfare just the same as monopoly may be restrained or as competition may be left unrestrained. The test in each instance is the public good. Where the restraint upon competition is for the public good, it is sustainable just as restraint upon freedom of action by the individual is valid where for the public good. Such is the basis of and the reason for the entire police power."

In what we have said, no opinion is intimated on the merits of this case. Not even the Commission can do that until it has heard the evidence at a hearing. The defendant Company, in its application for the permit, avers that it has for forty years conducted its business as a contract carrier, and since the advent of motor transportation has been a "contract motor carrier" as defined by statute. It may well be its destiny to continue that business for many years as heretofore. All we here decide is that a competitor may be admitted to allege and prove, if proof there be, that the Company has departed from its role as a contract carrier and has, in fact, become a common motor carrier, or any other matter going to its right to maintain its application; and that a contract carrier cannot avoid a hearing on his application by means of a mere recital therein that it was a contract carrier prior to March 15, 1933, or has received a permit since that date, within the operation of section 9 of the act.

These considerations make it unnecessary that we determine every point raised in the arguments and briefs. In view of the rehearing ordered before the Commission, however, we may notice one further point. In answer to the charge made by plaintiffs that the Commission's findings of fact on the permit application were unsupported by evidence, it is contended on defendants' behalf that the Commission had before it, in its consideration of the application, its own records in connection with former applications and former permits issued thereon to defendant Company. It does not appear, however, that these records or permits were put in evidence or made part of the record before the Commission in the matter of the permit No. 125, or in the later record made upon plaintiff's petition for a rehearing or reconsideration. In such case they are not properly a part of the record on review in this court. *Los Angeles & S. L. R. Co.* v. *Public Utilities Commission*, 81 Utah 286, 17 P. 2d 287, 291; *Spencer* v. *Industrial Commission*, 81 Utah 511, 20 P. 2d 618. Plaintiffs were never confronted with such records as evidence and have had no opportunity before the Commission to oppose them with objections as to competency, to the inferences or conclusions drawn therefrom, or to rebut the same by other evidence. They are not affected thereby in this court.

Had the Company's application remained ex parte, with no one opposing or contesting it, the Commission might perhaps have drawn its conclusions from any source satisfactory to it. But where the right to a permit is drawn in question by an adverse party whose interests are detrimentally affected by such extraneous records, the latter may object.

In view of the conclusions reached, it will be unnecessary to determine the constitutional questions presented in the petition and briefs in this court. The interpretation we have placed upon the act of 1935 makes it workable and free from the complexities encountered before the Commission. Until a constitutional question arises in the adminis-

tration of the act which injuriously affects a complaining party, we will not deal with it.

We conclude that the Public Service Commission did not regularly pursue its authority under the governing statute. The order denying plaintiffs' petition for a hearing is annulled, and the record is remanded to the Commission with instructions to fix a date for hearing, and to permit the plaintiffs to appear, offer testimony, amend if desired, and take any other steps appropriate, and thereafter to make findings and decision as the merits may require.

FOLLAND, C. J., and MOFFAT and LARSON, JJ., concur.

WOLFE, Justice (concurring in results).

I concur, but I shall approach the result in a somewhat different manner than does the opinion of the court. Where a party has a decision or order of an administrative or quasi-judicial body directed against him or the enforcement of it would involve a special, immediate, or a direct injury to him, he may, if the court sees fit in its discretion, sue out a writ of certiorari to have the proceeding reviewed whether or not he is a party to the record. Conversely, even if a party to the record, he has no standing where the order or decision does not directly injure him. The recent case of *Alabama Power Co.* v. *Ickes*, 58 S. Ct. 300, 306, 82 L. Ed. 263 (adv.), decided January 3, 1938, written by Mr. Justice Sutherland, makes clear that the term "direct injury" is one which, used in the legal sense, involves the violation of a legal right. The inquiry then resolves itself into the question of what enforceable legal rights of the plaintiffs does the order of the Public Service Commission (Contract Motor Carrier's Permit No. 125), granting the Sims a permit to operate as a contract motor carrier over all the highways of Utah, invade or threaten? As shown in the Alabama Power Case, where the competition is not illegal and the damage suffered is by reason of it, there is no right of the sufferer invaded

even though the competitor is able to compete because of the aid given by an act not in the power of the Legislature to pass or by the ultra vires act of a corporation.

In the case of *New Orleans Railroad Co.* v. *Ellerman,* 105 U. S. 166, 26 L. Ed. 1015, Ellerman operated certain wharves under a contract with the city of New Orleans giving him the right to collect revenues derived therefrom He brought suit to enjoin the execution of a lease by a railroad of its wharves to others who would directly compete with Ellerman by mooring vessels not connected with nor incidental to the railroad. The Railroad Company was by its charter and by statute restricted to the use of the wharves for railroad purposes. The court said:

"But if the competition in itself, however injurious, is not a wrong of which he could complain against a natural person, being the riparian proprietor, how does it become so merely because the author of it is a corporation acting ultra vires? The damage is attributable to the competition, and to that alone. But the competition is not illegal. It is not unlawful for any one to compete with the company, although the latter may not be authorized to engage in the same business. The legal interest which qualifies a complainant other than the State itself to sue in such a case is a pecuniary interest in preventing the defendant from doing an act where the injury alleged flows from its quality and character as a breach of some legal or equitable duty. A stockholder of the company has such an interest in restraining it within the limits of the enterprise for which it was formed, because that is to enforce his contract of membership. The State has a legal interest in preventing the usurpation and perversion of its franchises, because it is a trustee of its powers for uses strictly public. In these questions the appellee has no interest, and he cannot raise them in order, under that cover, to create and protect a monopoly which the law does not give him. The only injury of which he can be heard in a judicial tribunal to complain is the invasion of some legal or equitable right. If he asserts that the competition of the railroad company damages him, the answer is that it does not abridge or impair any such right. If he alleges that the railroad company is acting beyond the warrant of the law, the answer is, that a violation of its charter does not of itself injuriously affect any of his rights. The company is not shown to owe him any duty which it has not performed."

In the Alabama Power Company decision the case of *Frost* v. *Corporation Commission*, 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483, is distinguished from the Ellerman Case:

"Appellant there owned a cotton-ginning business in the city of Durant, Okl., for the operation of which he had a license from the Corporation Commission. The law of Oklahoma, Comp. Laws 1921, § 3713 [17 Okl. St. Ann. § 42], provided that no gin should be operated without a license from the commission, which could be obtained only upon specified conditions. We held that such a license was a franchise constituting a property right within the protection of the Fourteenth Amendment; and that while the acquisition of the franchise did not preclude the state from making similar valid grants to others, it was exclusive against an attempt to operate a competing gin without a permit or under a void permit. The Durant Co-operative Gin Company sought to obtain a permit from the commission which, for reasons stated in our opinion, we held would be void and a clear invasion of Frost's property rights. We concluded that a legal right of Frost to be free from such competition would be invaded by one not having a valid franchise to compete, and sustained Frost's right to an injunction against the commission and the Durant company."

In the instant case the railroad plaintiffs at least had more than a license. They have a franchise. And such franchise is protectable against competition from those not having a valid license. The plaintiffs who have a license or a franchise would suffer the invasion of a legal right as in the Frost Case, and therefore a "direct injury," if one not having a *valid* license were permitted to compete. The question then resolves itself into one to determine whether Sims' permit was valid. If so, plaintiffs have no standing to sue out the writ. If not, they have. The plaintiffs claim the permit is not valid because no hearing was had, and the order of the Commission does not rest on any substantial evidence; that the Commission's action is therefore arbitrary and without jurisdiction. The respondents assert, among other things, that no hearing is required; that the Commission, on application, may make its own investigation in its own manner without giving notice, without holding a hearing, or specifying the evidence revealed by the investi-

gation on which it forms its order. Thus, we see that the question of whether the plaintiffs have a standing depends on the question of whether notice and hearing are required. A solution of the second question will solve the first question.

The question may be thus posed: Has a common carrier by motor or rail, operating in a territory over, through or in which an applicant under the first two paragraphs of section 9, c. 65, Laws of Utah 1935, desires a permit to operate as a contract motor carrier, a right to a hearing in reference to such application?

I do not think the act expressly requires such notice and hearing. In fact, section 9 not only fails to provide for such notice and hearing, but states, "The Commission shall grant *on application* to any applicant who was a contract carrier as defined by this act on the fifteenth day of March, 1933," etc. It further states the Commission "shall furthermore grant on application to any applicant who received a permit to operate as a contract motor carrier between the fifteenth day of March, 1933, and the date on which this act takes effect, a permit to continue to operate in the same manner and over the same highways as the terms of said permit allowed."

I think the act goes further than failing to provide for notice and a hearing because in section 9 in the very next paragraph to that just above quoted, it specifies, "The commission upon the filing of an application for a contract motor carrier's permit by any other person than those referred to above in this section shall fix a time and place for hearing thereon and shall give the same notice as provided in section 6 hereof." Thus, it seems to have intentionally omitted as a requirement for those who were licensed as contract motor carriers before December 31, 1935 (the date when the act went into effect), the notice and hearing required by those who were not licensed to operate before said date. But there must be some way to determine whether the Commission granted a license on the conditions laid down by the statute.

Those applicants who were not licensed before December 31, 1935, would be required to meet other conditions than those who were so licensed. Those that were so licensed need only show that they were granted permits to operate as contract motor carriers before December 31, 1935, in which case the Commission would be obligated to grant them permits to "continue to operate in the same manner and over the same highways as the terms of said permit [the permit issued before December 31, 1935] allowed." But somewhere someone must be permitted to question whether such permits were previously granted and the manner in which and highways on which such permits allowed operation. Otherwise, the Commission would be supreme. It could arbitrarily, without determining such question or in fact in the face of discovery that no such permit had been issued, issue a permit to carry on the business of a contract motor carrier where the conditions laid down for such permit in the first two paragraphs of section 9 had never been met.

I am not prepared to say that granting the Commission such a power without requirement of notice or hearing might be lack of procedural due process of law. In section 11, provision seems to be made for the granting of temporary, seasonal or emergency permits without notice or hearing. But I am inclined to the view that if permits which were not seasonal or for emergencies were granted under the guise of this section 11, some recourse could be had by those whose property rights were invaded.

I do not think that in the first instance under section 9 the Commission is required to give notice and hold a hearing to determine whether the applicant is one of those entitled under the first two paragraphs of section 9 to a permit, but I think when a common carrier by motor or rail, whose territory is affected by the permit, intervenes by application for a rehearing (the only opportunity it would have to intervene) and asks a reconsideration and a hearing on the permit granted, such hearing must be granted. Such

hearing was not granted in this case, and it is the order denying such hearing that plaintiffs want reversed. I think the carriers whose property rights might be invaded if the permits might not be valid had the right to demand and obtain a hearing on the question of whether the permits had been validly issued, i. e., whether the conditions which applicant had to meet in order to obtain such a permit had been met. I think the Commission in denying such hearing upon the application of one so situated as above set out acted in excess of its authority. I concur on the ground that when one situated as above asks for a hearing on whether a permit was properly granted under the provisions of the first two paragraphs of section 9, it must be granted.