## UTAH LIGHT & TRACTION CO. v. PUBLIC SERVICE COMMISSION et al.

No. 6255.   Decided November 7, 1941.   (118 P. 2d 683.)

101

See 42 C. J. Motor Vehicles, sec. 154; 37 Am. Jur., 529.

*George R. Corey* and *Calvin Behle,* both of Salt Lake City, for plaintiff.

*Grover Giles,* Atty. Gen., *A. C. Melville* and *J. Allan Crockett,* both of Salt Lake City, and *Glen E. Howe,* of Murray, for defendants.

LARSON, Justice.

The plaintiff, hereinafter called the Traction Company, brings this action for a statutory review, pursuant to Section 76-6-16, R. S. U. 1933, of a report and order of the defendant Public Service Commission of Utah, hereinafter called the Commission, issuing a certificate of convenience and necessity to Airway Motor Coach Lines, Inc., hereinafter called the "Airways," to render service as a common carrier of passengers between Salt Lake City and some nine smaller communities in the south end of Salt Lake County. On January 24, 1940, Airways filed with the Commission its application for a certificate of convenience and necessity to render the service authorized by the above order. The Traction Company in writing protested the application. At the hearing the Salt Lake City and Utah R. R. Company, and some individuals, joined in the protest. The geographical facts involved in the application and the protest briefly stated reveal: Salt Lake City, population 149,934, has for many years through the Traction Company been served by an electric street railway, and later by motor bus service and in connection with that service it for many years prior to 1933 operated a line for common carrier passenger service between Salt Lake City and Murray, Midvale, and Sandy, smaller communities lying to the south. Such service, schedules, and fares have since 1917 been under the general supervision and operated pursuant to order of the Commission. Murray, population 5,740, is seven miles south of Salt Lake City; Midvale, population 2,875, is about ten miles south and 2.5 miles west; Sandy, population 1,487, about 15 miles south of Salt Lake City. Communities in the south end of Salt Lake County, not served by bus or street railway, are Crescent, south of Sandy; West Jordan, west of Midvale and to the south thereof; South Jordan, and

Riverton, and Taylorsville, about three miles west of Murray. Airways were operating a bus line into Holladay, nine miles southeast, along 9th East Street into Draper, 18 miles south of Salt Lake City under a certificate previously issued.

After hearing the Commission filed its findings and order granting the certificate, called in the files "Report and Order of Commission." The Traction Company seeks review alleging:

A. That the Commission failed to make findings of fact on issues material to the hearing.

B. That some of the findings of fact are not supported by any substantial evidence.

C. That the Commission acted contrary to law and in an arbitrary and capricious manner. We note them seriatim.

A. Complaint is made that the Commission did not make findings as to the extent of existing service being rendered by the Traction Company into the territory affected by the application; as to whether such service is inadequate, and if so, in what particulars it is inadequate; and as to whether or not the Traction Company is willing to render more service. As to territory not being served by the Traction Company it is argued that there are no findings as to what service is necessary and convenient to such territory, and as to whether the Traction Company is now ready and willing to render such service.

The Commission expressly found that the Traction Company "operates a bus service southward on State Street serving Murray, Midvale, and Sandy, on a schedule of 22½ minutes during peak periods, and 45 minutes at other times" and that the "Salt Lake and Utah R. R. Corporation operates in the territory adjacent to Redwood Road [through the west side of Salt Lake Valley] with five trains north into Salt Lake City and five trains south each day." Of course the Commission need not descend to such details as to find the number of people riding each bus or train daily. The Commission did find that the new

service would stimulate the use of public carriers rather than private cars and that such service as the Airways would give would meet the demands of the public more adequately. It found that the territory above set forth as without bus service is in need of bus service both intercommunity, and into Salt Lake City, such as Airways offers it. It found that this new service was in the public welfare; that it would tend to develop new homes and new enterprises in the territory beyond Salt Lake City limits, and that general development of that area would be promoted and stimulated by the new service. Such are proper matters for the Commission to consider. *Mulcahy* v. *Public Service Commission,* 101 Utah 245, 117 P. 2d 298. It found that the part of the territory to be served by the Airways is new territory being pioneered; and that the roads are not overburdened with traffic, and the new service will not interfere with the use of the roads by the general public. It found that new service is needed, at least to the extent set forth in the application, and therefore to that extent the service now rendered is inadequate. It found that the Airways permit will not substantially detract from, nor impair existing common carrier service; that it will not be detrimental to the people of the State of Utah or the localities to be served. These findings are not set forth in the detail and particularity used by courts of law whose judgments determine ultimate rights of life and property, title, nor need they be so definite nor orderly. These determinations of the Commission involve questions of license, or privilege between the sovereign people and the individual who seeks to obtain or enjoy such right or privilege in the common good. The welfare of the public is the paramount issue. These rights are given and regulated to protect the people generally and to insure an opportunity for all individuals, and each community, to grow and develop and assure its inhabitants the most complete and abundant life possible, commensurate with equal privileges for all others. *Mulcahy* v. *Public Service Commission,* supra; *North Bend*

*Stage Line* v. *Denney,* 153 Wash. 439, 279 P. 752; *Campbell* v. *Illinois Commerce Commission,* 334 Ill. 293, 165 N. E. 790. Without discussing at this point the question as to whether and to what extent the Commission is required to make finding on all matters which may be disputed or inquired into at the hearing, the findings are clearly sufficient to cover all points urged except that there is no finding as to whether the Traction Company is willing to render the new or added service now to be performed by the Airways. This specific point will be disposed of by what is said later in connection with another question.

B.   It is next urged that four findings of the Commission are not supported by any substantial evidence. Two of the statements claimed to lack support in the evidence have to do with the matter of rates, one historical in nature, and the other a comparison in percentage of the difference between the rates now charged by the Traction Company and the corresponding schedule proposed by the Airways. The historical recital is not made as a finding of fact but merely to indicate why the Commission views the rate structure as entering into consideration of the question as to this permit. The argument as to the other one admits a very substantial difference in rates as shown by the evidence but argues that in one instance the percentage difference is not as great as the figure recited by the Commission. The variance in the percentage may be accounted for by the method of computation. If the difference is figured as percentage of Traction Company charge the result differs from that reached when figured as percentage of the proposed Airways charge for the service. Complaint is next made that the finding, "The granting of this application will not substantially detract from nor impair existing common carrier service   *   *   *" lacks support in the evidence. The Commission found, and there is evidence to support it, that the more frequent trips, the lower fares, the type of service, the enlarged territory served, and such factors would stimulate and increase the volume of common carrier traf-

fic. There is also evidence to show, and a finding that the rate structure and the advantages of transfer will be such as to probably keep for the Traction Company most of its business from people who ride regularly. The law does not require that the revenues of an operating company must be guaranteed at its existing figure before another company may enter the field. We think it unnecessary to review each of the matters considered and found in the report of the Commission. The order may still be valid though the correctness of certain findings cannot be sustained. The ultimate question is whether there was substantial evidence on all points essential to support the order of the Commission. Application of *Dakota Transportation*, (S. D.), 291 N. W. 589. We cannot say that the finding is without support in the evidence.

C. We come now to the Traction company's third point of attack, that the action of the Commission is is arbitrary, capricious and contrary to law. Four points are here made (1) That the Airways had not obtained franchises or licenses from the local county and city authorities; (2) That the Commission issued the certificate after finding the Airways was financially unable to perform the proposed service; (3) That the issuance of the certificate was based upon the "lower fare" schedule offered by Airways rather than upon "convenience and necessity"; (4) That the existing carriers should have been given the privilege of furnishing such part of the added service as they may be willing to furnish.

1. The argument that the Commission acted contrary to law as to point (1) is predicated upon subsection 3 of Section 76-4-24, R. S. U. 1933, which in part reads:

"Every applicant for such a certificate shall file in the office of the commission such evidence as shall be required by the commission to show that such applicant has received the required consent, franchise or permit of the proper county, city, municipal or other public authority."

If we read only that part of the subsection it would appear that before the Commission issues a certificate of convenience and necessity the applicant must show he has received a franchise from the county or city in or through which he proposes to operate. But such provision has no application to a situation such as here presented. The section provides:

76-4-24.

"(1) No railroad corporation, street railroad corporation, aerial bucket tramway corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, heat corporation, automobile corporation or water corporation shall henceforth establish, or begin construction or operation of a railroad, * * * without having first obtained from the commission a certificate that present or future public convenience and necessity does or will require such construction * * *.

"(2) No public utility of a class specified in subsection (1) hereof shall henceforth exercise any right or privilege under any franchise or permit hereafter granted * * *.

"(3) Every applicant for *such a certificate* shall file in the office of the commission such evidence as shall be required by the commission to show that such applicant has received the *required consent, franchise or permit* of the proper county, city, municipal or other public authority. The commission shall have power, after a hearing, *to issue said certificate as prayed for or to refuse to issue the same, or to issue it for the construction of a portion only of the contemplated railroad, street railroad, aerial bucket tramway, line, plant or system, or extension thereof,* or for the partial exercise only of said right or privilege and may attach to the exercise of the rights granted by said certificate such terms and conditions as in its judgment public convenience and necessity may require. * * *" (Italics added.)

It is evident that the provisions of the subsection do not apply to certificates such as that here involved but only to the classes specified in the subdivision itself: This is further evident from the fact that a city or municipal corporation has no power under our statutes to grant to or require an automobile corporation (defined in subdivision 12, Section 76-2-1, R. S. U. 1933), to have a local franchise to engage in business. Cities and incorporated

towns have no general grant of power to require or grant franchises. They may grant franchises to railroads, street railways, tramways, and union railroad depot companies (Section 15-8-33), to waterworks companies, gas companies, electric light and telephone lines (Section 15-8-14); to telegraph and all wire lines and pole lines (Section 15-8-21); to gas, electric or lighting works (Section 15-8-20). And there is a special provision as to railroads in Section 77-0-8. The Constitution, Article 12, Section 8, reserves to cities and incorporated towns the franchise power of street railway, telegraph, telephone and electric light companies. These sections cover all the franchise powers of cities and towns as set forth and granted by the statutes. That an automobile corporation such as this is not a street railway was held in *Utah Rapid Transit Co.* v. *Ogden City et al.*, 89 Utah 546, 58 P. 2d 1. See, also, subdivisions 8 and 12 of Section 76-2-1, R. S. U. 1933, defining both terms. As to motor transport companies (automobile corporations), the cities' power is found in Section 15-8-39, R. S. U. 1933, providing

"they may *license, tax and regulate* \* \* \* *stages and busses,* sight-seeing and touring cars or vehicles, cabs and taxicabs, \* \* \* hackmen, draymen, and *drivers of stages, busses,* sight-seeing and touring cars, cabs and taxicabs and other public conveyances." (Italics added.)

There is no power granted to require or grant a franchise for the use of the streets and highways for the purpose of traveling thereon as used by the public generally. A franchise is the privilege of doing that which does not belong to the citizens generally by a common right. 12 R. C. L. p. 174. As to streets, it is the right to do something in the public highway which except for the grant would be a trespass. *People* v. *State Board of Tax Com'rs*, 174 N. Y. 417, 67 N. E. 69, 63 L. R. A. 884, 105 Am. St. Rep. 674; 12 R. C. L. p. 175. Thus the right to lay rail, or pipes, or string wires or set poles along a public street is not an ordinary business in which everyone may engage, or a use everyone may make

of the street, but is a special privilege, a franchise to be granted for the accomplishment of public objects. They are required only in cases in which it is sought to impose upon the street a special burden which cannot be imposed generally, that is, to burden the street with a special privilege which the public generally may not likewise enjoy. Business such as that of the Airways does not so burden the street. It uses the streets only for purposes of travel and transport in the same manner as the public generally. It is a business not subject to franchise requirements.

Does the use of the words, *consent, franchise or permit* in the section require any further showing of some other right or grant from the cities less than a franchise, such as a license or other consent or permission? The section provides that the

"applicant * * * shall file in the office of the commission *such evidence as shall be required by the commission* * * * that such applicant has received the *required consent*, etc." (Italics added.)

The statute does not say the applicant must file the franchise or consent or permit, but only that it must furnish "such evidence as *shall be required by the commission*." There is neither in the record nor the briefs any reference to any rule or order of the commission indicating what evidence on such matters the commission requires. We must assume therefore that any rule the commission had on the matter was complied with, especially as the question was raised and presented in the "Petition for Rehearing" before the commission. The Traction Company in its brief on that petition states that the evidence supports the allegation that applicant had made arrangements for all necessary franchises or licenses required by local communities. The evidence showed that Airways had a franchise in Salt Lake City where it had some local intracity routes; that it had consent and permission of Murray City and promise of any desired franchise (testified to by Davis, president of applicant and two of the three commissioners of Murray) ; that

it had contacted the proper city officials of Midvale; and it had made arrangement for all necessary franchises in all towns where it proposed to operate. Furthermore the statute says it shall make proof that it has "received the *required* consent, franchise or permit." If no license or permit is *required* by the local authority of course no proof need be made that such consent or permit has been obtained. We cannot assume that any or all of the local authorities have any ordinance requiring any license or other consent or permit to operate as an intercity motor transport of persons. And in the scope of our reviewing power we cannot indulge in presumptions against the regularity of the commission's actions.

2. That under the law the commission should not issue a certificate to a party financially unable to perform the service permitted will not be disputed. But the question of financial ability is one to be determined by the commission. Section 6, Chapter 65, Laws of Utah, 1935. ▇▇▇ The matter of financial ability was gone into on the hearing, and the Commission made findings thereon which reflect that it sensed the importance of this matter, and that it investigated the financial condition of the Airways. It declared its purpose to "be sure that the applicant [Airways] is financed at least to the extent necessary to carry the proposed operation through the pioneering period," and directed that the Airways furnish not less than $15,000 additional in cash for the benefit of these operations before issuance of the permit. The findings with respect to financial ability finds support in the evidence. We cannot disturb it.

3. Is the order for issuance of the certificate based upon a difference in rate rather than upon convenience and necessity? The Report and Order

[Findings] of the Commission states:

"The Commission is of the opinion that even though some of the territory is now being given common carrier service, public conven-

ience and necessity would justify the issuance of the authority requested by the applicant so that the aforementioned territory which does not now have common carrier service might be afforded the opportunity of such service.

"Further, it appears proper to grant to the public in the remainder of the territory the privilege of enjoying more adequate facilities at such savings to themselves as this applicant proposes. * * *"

This finding answers the point. True, the commission in its report devotes some space and attention to the matter of rates. Certainly the question of rates to be charged under the certificate is a proper element to take into consideration. We will discuss its relationship further in connection with the remaining point urged by the Traction Company.

4. It is vigorously asserted that the basis of the utilities regulation act is controlled monopoly, and that no new entry should be permitted in a field in which an existing utility is operating, unless and until such utility refuses to furnish any new or further service ordered by the commission. and then only to the extent that the existing utility is not willing to undertake the service. But such is not the foundation upon which our act for the control of public utilities is founded, nor should it be a primary governing principle in the action of the commission. The commission was established, and authority over utilities vested in it, for the purpose of assuring the public an adequate service at reasonable rates. A detailed analysis of the nature, purpose and controlling principles of our Public Utilities Act is made in the case of *Mulcahy* v. *Public Service Commission*, [101 Utah 245, 117 P. 2d 305], cited supra. Discussing the same question we there said:

"Should such new service be rendered by existing carriers or by the new applicant? This question poses for the commission, not the finding of a factual answer, but the determination of a matter of policy. Which in the opinion of the commission will best subserve the public convenience, necessity and welfare? And in determining this matter the commission under the statute may and should take into consideration the existing transportation facilities, their invest-

ment, the taxes they pay, the services they have rendered and are now rendering; the need of a continuation of such services, the effect upon such services of a new obligation to serve; the effect upon such services of a new competitor in the transportation field; the effect of a new competitor or carrier upon the economic, industrial, social and intellectual life of the territory, and other matters which may affect the public welfare, and the growth and development of the life in, and resources of the state. That existing carriers engaged in transportation to and from a certain field or territory, rendering the service it is permitted or ordered to do, reasonably, adequately and efficiently, is not lightly or ruthlessly to be interefered with, or subjected to needless competition, is evident from the provisions of the statute. Section 5 of Chapter 65, Laws of Utah 1935 * * *.

"An applicant desiring to enter a new territory, or to enlarge the nature or type of the service he is permitted to render must therefore show that from the standpoint of public convenience and necessity there is need for such service; that the existing service is not adequate and convenient, and that his operation would eliminate such inadequacy and inconvenience. He must also show that the public welfare would be better subserved if he rendered the service than if the existing carrier were permitted to do so. *The paramount consideration is the benefit to the public, the promotion and advancement of its growth and welfare.* Yet the interests of the existing certificate holder should be protected so far as that can be done without injury to the public, either to its present welfare or hindering its future growth, development, and advancement. * * * Having given due consideration to those matters the commission determines whether the existing carriers or a new one should be permitted to render the proposed service. If the commission's determination finds justification in the evidence, it is not a law question and we cannot review or modify it or set it aside." (Italics added.)

If the need for new or additional service exists, it is the duty of the commission to grant certificates of convenience and necessity to qualified applicants, but when a territory is satisfactorily serviced, and its transportation facilities are ample, a duplication of such service which unfairly interferes with the existing carriers may undermine and weaken the transportation setup generally and thus deprive the public of an efficient permanent service. True, existing carriers benefit from the restricted competition, but this is merely incidental in the solution of the

problem of securing adequate and permanent service. The public interest is paramount. Application of *Dakota Transportation, Inc.,* (S. D., 291 N. W. 589. Of course the public interest may well be subserved by preventing waste. See dissenting opinion of Brandeis in *New State Ice Company* v. *Liebmann,* 285 U. S. 262, 52 S. Ct. 371, 376, 76 L. Ed. 747. But the waste must be such as would injure the public or interfere with its interests, growth and development. It must not be a prevention of waste carried to the extreme where it prevents or interferes with progress in equipment or methods or ways of serving the public. And the determination as to whether waste would result, or whether the waste which did result would be so against the public welfare and interest that it should be prevented, are questions for the commission to determine. It may be that in some cases the public welfare or interest would require, or be better subserved by the elimination of existing service or equipment. This too is for the commission to decide.

In cases such as this, where there is an extensive new territory to be served, which would continue without bus service unless the application be granted, and the service to such communities would be impracticable and of only half its public value, if rendered, unless it had a direct connection with the larger centers, such service should not be denied because in a limited territory it came into competition with an existing carrier. These services must be so rendered as to promote the public welfare, and the first determination of that matter rests with the commission. On the record in this case we cannot say that the determination of the commission was arbitrary or capricious. This court has held that it cannot substitute its judgment for that of the commission and disturb its findings where there is any substantial basis in the evidence for the finding or where the order of the commission is not unreasonable or arbitrary. In a proceeding to review an order of the commission judicial action cannot supplant the discretionary authority of that body. The review by this court,

exercising judicial functions only, cannot extend beyond the questions as to whether the commission acted within its constitutional and statutory powers, and whether its determination and order is supported by the evidence and is reasonable and not arbitrary. Section 76-6-16, R. S. U. 1933; *Fuller-Toponce Truck Co.* v. *Public Service Commission*, 99 Utah 28, 96 P. 2d 722; *Mulcahy* v. *Public Service Commission*, supra; 57 C. J. 82; *Oro Electric Corp.* v. *Railroad Commission*, 169 Cal. 466, 147 P. 118. As we have pointed out, there can be no substitution of the judgment of the reviewing court for that of the Commission, acting within the field of administrative discretion. The judicial review of the evidence and findings is merely to determine whether the Commission has exceeded its authority by making a determination which is unreasonable or arbitrary. Upon a careful consideration of the record and the statute defining the considerations which shall control the determination of the Commission, we do not find that the order of the Commission herein is either unreasonable or arbitrary and without substantial support in the evidence.

The order of the Public Service Commission is affirmed.

McDONOUGH, J., concurs.

WOLFE, Justice (concurring).

I concur. However, one observation may be added to the opinion. Conceding that a franchise has the special meaning set out in the prevailing opinion, Sec. 76-4-24, Sub-section 3, nevertheless provides that the applicant shall file in the office of the Commission such evidence as shall be required by it to show the required *consent,* franchise or *permit.* Certainly if a license can be required and any municipality through which the applicant runs requires a license, such license is a permit without which the applicant is not supposed to run. I cannot see, therefore, that the compliance of the applicant in presenting evidence of permission or licenses, if they are properly required by ordinance, can

be avoided. But in the instant case, there was no evidence that any of the towns or cities through which Airways runs required a license or permit. It may be that cities cannot require licenses of buses engaged in intercity traffic, that being a state and not a city utility. We are not informed by the record, if such license may be required, that the ordinance of any city through which Airways runs has required it. Inasmuch as we have nothing before us to show that any consent or permit is required, we cannot say that the Commission failed to exact a showing of the required consent.

PRATT, J., dissents.

TRUEMAN, District Judge (dissenting).

I dissent. I think the majority members of this Court in subscribing to the prevailing opinion fail to comprehend the extent of the jurisdiction of the Public Service Commission to supervise and regulate public utilities in Utah, and I think by means of an improper and erroneous interpretation of Section 76-6-16, R. S. U. 1933, the so-called "limited review statute," they fail to comprehend the extent of the obligation imposed upon this Court to review the acts of the Commission.

The Public Service Commission of Utah by its order of March 14, 1940, granted its Certificate of Convenience and Necessity No. 534 to the defendant, Airway Motor Coach Lines, Inc., authorizing the Airway Motor Coach Lines, Inc., to render such service as a common *motor* carrier of passengers for hire between Salt Lake City, Utah, and Murray, Sandy, Crescent, Draper, Midvale, West Jordan, Riverton, Taylorsville, and Bennion, Utah, over certain designated routes, although the applicant had not, as required by law obtained and received the required consent, franchise or permit of the proper county, city, municipal or other public authority as provided under sub-section 3 of Section 76-4-24, R. S. U. 1933.

Section 76-6-16, R. S. U. 1933, provides for a review in this court when the applicant or any party to the proceedings deems himself aggrieved by an order of the Public Service Commission of Utah. The procedure, to have such order reviewed in the Supreme Court of Utah, is in accordance with that statute, and simulates certiorari.

Section 76-6-15, R. S. U. 1933 provides that no recourse may be had to the Courts until after a motion for a rehearing shall have been made and denied by the Commission, in accordance with that statute.

The theory of the requirement in Section 76-6-15, R. S. U. 1933 that motion for a rehearing shall be made before the Commission before recourse may be had to the Courts, is to afford the Commission an opportunity to correct any error or abuse, the subject of a motion for a rehearing, thereby eliminating useless litigation when redress can be had before the Commission.

Section 76-6-16, R. S. U. 1933 limits the review to determine *whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any constitutional rights of the petitioners under the constitution of the United States or the State of Utah.* Obviously such constitutional questions are not dependent on that statute to give them life and vitality, but such questions exist entirely apart from the statute, unless the procedure provided by this statute is an adequate remedy to protect any and all violation of any constitutional provisions. I shall not stop to review this point, because, unless the statutory remedy is adequate, the mere statement of the contention in the light of its environment suffices to destroy it.

A very pertinent question to be determined on this appeal is the construction to be placed on Section 76-6-16, R. S. U. 1933 and the meaning of the phrase: "Whether the commission has regularly pursued its authority."

Utah is committed to the philosophy of a Commission regulation of all public utilities in the State.

In Utah, the Commission exercises control over motor vehicle common carriers, within and between municipalities, to *supervise* and *regulate* such motor vehicles in accordance with the terms, purport and meaning of the statutes.

And the *extent* to which the Commission may exercise supervision and regulate motor vehicle common carriers as well as other public utilities in Utah is covered by Section 76-4-1, R. S. U. 1933, as follows:

"The commission is hereby vested with power and jurisdiction to *supervise* and *regulate* every public utility in this state, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

Section 76-6-16, R. S. U. 1933 restricts the question of review by the Supreme Court as to the legality of any order or decision rendered by the Commission to determine *"whether the Commission has regularly pursued its authority."*

I shall not pause here to comment upon the theory and purpose of the law in that particular, but will presently consider that question, and I shall also further on in this opinion consider the *power* and *jurisdiction* of the Commission to *supervise* and *regulate* public utilities *including motor vehicle common carriers* in Utah as provided by Section 76-4-1, R. S. U. 1933.

In determining whether the Commission has regularly pursued its authority in this case the Supreme Court should ascertain from the record before it whether the Commission has exercised power within its jurisdiction as defined by Section 76-4-1, R. S. U. 1933.

By the Public Utilities Act, the Commission is vested with the power to regulate every public utility in the State. The term "public utility" as defined in the act, embraced every corporation or individual, and every town or city owning or operating any equipment within the State, which we now

classify among our public utilities, except as that term may be modified by the holding of this court in the opinion in the case of *Garkane Power Co.,* v. *Public Service Commission,* 98 Utah 466, 100 P. 2d 571, 132 A. L. R. 1490.

In the case of *Salt Lake City et al.,* v. *Utah Light & Traction Co.,* 52 Utah 210, 173 P. 556, 3 A. L. R. 715, this Court recognized the duty of the Commission, under the Utility Act, to find the facts on the questions under consideration and investigation by it.

The judgment of the Commission must be based upon the facts found, and the facts found must be applicable to the purpose and intent of the law to regulate public utilities.

It is the duty of the Commission, in the exercise of its reasonable judgment to determine the questions presented to it and render its judgment upon the facts found.

The findings of fact contemplated by the legislature are the written statements of the facts on the questions under consideration and investigation, as established by the evidence presented to the commission, and upon which it bases its judgment. The law does not define the kind of findings the commission is required to make.

It is presumed the legislature intended the findings of fact of the commission to be the same kind and character known to our judicial system and employed in our courts and defined in our Code of Civil Procedure at the time the Utilities Act was adopted. See Chapter 26, Title 104, R. S. U. 1933, § 104-26-1 et seq., also *McCarthy et al.* v. *Public Service Commission,* 94 Utah 304, 77 P. 2d 331, citing *Southern Surety Co.* v. *Arter,* Tex. Com. App., 44 S. W. 2d 913-916, and the analogy drawn therefrom to the adaptability of code procedure before administrative agencies in absence of legislative fiat.

The opinion fails to announce the criterion rule or test by which the commission is guided in forming a correct judgment in exercising its power and jurisdiction to *supervise* and *regulate* public utilities as required by Section 76-4-1, R. S. U. 1933.

The case of *Sheppard* v. *Owl Refining Co.,* Tex. Civ. App., 68 S. W. 2d 1101, 1102, develops the theory that the purpose of a certificate of convenience and necessity is to limit the number of those engaged in a particular business of *public interest,* and to vest in some official or board the power to withhold such certificate in the *public interest.*

That case arises out of a regulatory statute to enforce a tax on distributors of motor fuel, and analyses many cases affected with a *public interest* requiring the issuing of a certificate of convenience and necessity as a prerequisite to engage in such business.

The *public interest* is and should be the standard to guide the determinations of the commission.

One of the early defects in the commission form of regulation was the practice of public utility corporations to withhold evidence at hearings before the commissions to be later presented in courts, which resulted in a tendency to substitute the old technical process of *judicial regulation* for *commission regulation.* With statutes limiting questions reviewable on appeal the commission regulation attained greater power, respect and prestige in that the parties before the Commission have nothing to gain by withholding evidence at hearings. A lack of appreciation of the philosophy underlying the limited appeal statutes is no doubt responsible for many ill considered cases that rise to inject confusion in clear and logical consideration of the issues in cases of this character. Many laymen and the prevailing opinion in this case construe such statutes as a restriction on the Courts without considering that the purpose of such statute was to enhance the prestige of the Commmission.

So that the greater responsibility is placed upon the Commission to devise and carry into effect the means and methods of control of public utilities with which it is charged by the legislature; and, likewise greater responsibility rests upon the Supreme Court to give to the Commission in its opinion a sufficiently didactic interpretation of the law to determine whether it has *regularly pursued its authority.*

Some opinions would indicate a dereliction in that behalf on the part of some Commissions as well as some Courts.

The Utah statutes provide for the Commission to exercise general supervision, fixes: *rates,* fares, tolls, charges, *regulations,* practices, facilities and methods, and may establish uniform accounting systems, make investigations, reports, etc. (See Compiled Laws of Utah 1917, Title 91, now Title 76, R. S. U. 1933, as amended).

The order under review here was made and entered by a divided commission, that is by two members of the Commission. The third Commission member dissented.

Public utilities have certain characteristics that are not possessed by the ordinary business enterprise. These characteristics are not in every case peculiar to public utilities, but taken in the aggregate they are sufficiently important to put the industry in a class by itself.

Public Utilities are closely associated with our conception of civilization and were known and subjected to regulation in ancient and medieval as well as modern times. Probably the oldest public utilities are those connected with water supply and sanitation.

The law has long recognized this classification for it has always subjected *public utilities* to special regulation, by *legislative* or *judicial* regulation or by *competition. Competition* and *regulation* are inconsistent policies. If we are to have competition we do not need *regulation,* if we are to follow the legislative policy and have *regulation* then we do not need *competition.* Such certificate should be issued in the public interest.

The factual aspect of the question whether a contemplated service is in the "public interest" is a matter to be determined from the evidence.

The court should not substitute its judgment for that of the commission where there is conflict in determining what is a "public interest." See *Gilmer* v. *Public Utilities Commission,* 67 Utah 222, 247 P. 284.

But the commission can not act arbitrarily, and the acts of the commission and its determination of what is a "public interest" must be in furtherance of its powers and jurisdiction.

The legislature can not delegate to an administrative agency the power to make its own law, but may delegate to it power to determine some fact, or state of things, upon which the law makes, or maintains to make, its own action depend.

And while the court will not substitute its judgment for that of the commission on questions of fact, the order of the commission must be grounded upon some declared policy or regulatory rule based upon legal principles. The commission is amenable to the court on questions of law.

The immediate conscious effect produced in the minds of the commission in a hearing or series of hearings *affecting a single case,* like the instant case, are arbitrary conclusions unless applied with some recognized principle of law. The acts of the commission must be based upon declared or recognized legal principles of law.

*To determine whether the commission has regularly pursued its authority,* includes a determination of whether the order or decision under review violates any declared or recognized legal principle of law.

So that while the court is bound by the *facts* found by the commission from the evidence, it is not bound by the rule of law applied by the commission to those facts, and it is anomaly if this court is so bound, as the prevailing opinion suggests it is. The commission had before it mixed question of law and fact. This court had befort it *the legal question of whether the commission has regularly pursued its authority.*

The holding of the court in the case of *Fuller-Toponce Truck Co.* v. *Public Service Commission,* 99 Utah 28, 96 P. 2d 722, that where there is evidence to support the findings of the commission this court will not interfere, should

prevail only when *the commission has applied the facts to some declared or recognized principal of law.*

Our statutes, unlike some statutes of other jurisdiction, do not provide for any particularly modified kind of evidence, such as "substantial evidence" and "sufficient evidence" etc.

Without going into the question of what is evidence we may say generally that:

"Evidence signifies that which [demonstrates], makes clear or ascertains the truth of the very fact or point in issue, either on the one side or the other." See *Lynch* v. *Rosenberger*, 121 Kan. 601, 249 P. 682, 683, 60 A. L. R. 376.

So that in exercising its powers and duties the acts of the commission must be based upon some economic interpretation of the needs of the State, promulgated by the commission as a declared policy or some recognized provision of law, such, for instance, as was applied by the Wisconsin Railroad Commission in a telephone case which held the introduction of competition was not warranted because the service was unsatisfactory, due to conditions the occupying public utility could remedy. See the case of *Town Line Farmers Independent Telephone Company* v. *Red River Telephone Company*, P. U. R. 1916-F, page 211.

The commission as a question of economic interpretation of the law, as will be explained presently, should not permit paralleling of lines, with the attending economic loss in any case where facilities already at the command of the parties are reasonably adapted to their requirements or can be made so by an appropriate exercise of the commission's jurisdiction.

The term "public utility" is used in a very loose sense by people in general, and in a more restricted and defined sense by courts, where among other definitions it has been enigmatically defined as a business *"affected with a public interest,"* which serves only to deepen the mystery of the italicized words, but such definition is indicative of the thoughts

by which the legal conception of a public utility becomes concrete, as distinguished from the statutory definition set forth in subsection 28 of Section 76-2-1, R. S. U. 1933, which defines certain public service corporations ipso facto as public utilities.

In the true sense the term "public utility" is based upon the importance, not of the supply of commodities in general, but of *single commodities or services in the economy of man,* and this conception of the actual fact is entirely foreign to the thought expressed in the prevailing opinion.

The law has recognized many forms of regulation of public utilities, and in addition to others mentioned in this opinion some of the more recent methods have been by perpetual or limited term franchises, indeterminate permits, and the most recent forms of regulation by state or federal commissions. There are other recognized methods of control too numerous to mention.

To review these many methods of control that have been employed in the past to regulate public utilities would extend this opinion without corresponding benefit, and without pausing at all to notice these numerous forms of regulation I shall confine my comments in this case to the two methods before us, namely: " *'competition'* and *'regulation' by the state commission,"* subject to local limitations of the legislative power which the prevailing opinion throws aside as of no consequence.

The modern movement for regulation of Public Utilities by Commissions dates from about A. D. 1907. Prior to 1907 there were a few commissions with control over public utilities and commission regulation of public utilities prior to 1907 was conspicuously absent.

There were several reasons for the failure of states to create public utility commissions in the period prior to 1907.

One was the belief that the remedy for public utility monopolies was *competition.* The belief in the efficacy of *competition* was deep rooted and it took a surprisingly long ex-

perience with it before the people clearly perceived its inadequacy as a measure of relief.

There are some who still favor competition in public utility fields, as witness the testimony, opinions and conclusions of those who have so testified in this case, and generally the enthusiasm with which the *motor bus* is recommended as a competitor of the street railway.

Another reason was the wide spread conviction that the regulation of the public utilities was essentially a *municipal function*, but the prevailing opinion accords the municipality little consideration even in the face of a statute recognizing such right, and the suggestion in the prevailing opinion and the conclusion to be drawn therefrom that the municipality is impotent to do anything about the motor bus competition or regulation is to say the least revolutionary.

I shall not consider the latter method of control, except so far as that method of control may be involved in the failure of the applicant to obtain and receive the required consent, franchise or permit from the proper county, city, municipal or other public authority as required by law, and provided under subsection 3 of Section 76-4-24, R. S. U. 1933.

To say there is no evidence in the record that any of the towns or cities through which the Airways runs required a license or permit does not face the issue. Let us meet the issues without introducing further uncertainties in the law. The burden is upon the Airways to show that it had complied with the statute. Compliance with all statutes are conditions precedent to issuing any certificate of convenience and necessity. Section 76-4-24, R. S. U. 1933, subsection 3, provides that the applicant shall file in the office of the commission evidence to show it has the required consent, franchise or permit.

The supplying of public utilities service as a class requires a very large capital investment of from four to five dollars for every dollar of annual gross receipts, or to state the

matter in another way, public utilities expect to turn a capital outlay not to exceed once in four to five years, as against an average turnover for the merchant of five to ten times per year, and the manufacturer once or twice each year; and gives life to large fixed expenses; that is, expenses that do not vary in proportion to the changes in volume of business.

Section 76-4-1, R. S. U. 1933, committed the State of Utah to a philosophy of *regulating* existing public utilities by placing the regulation of such public utilities in a mandatory commission, with statutory warrant, jurisdiction and power to regulate all public utilities in the State over which it exercises jurisdiction, so that the public may receive the highest grade of service consistent with the earning of a fair return upon their investment.

Under the administration of a *mandatory commission* nothing can be more suicidal than to have regulation settle down to a *complacent routine* which contents itself with mere adjustment of differences.

It cannot be denied that the energetic and progressive competition of the *motor bus* has had a reasonable influence in the monopolies of the street railroad companies. But the commission, acting in the *public interest,* should withhold its certificate of convenience and necessity, because it is not in the *public interest* to require a public service utility to restrict or render inadequate service elsewhere in order to compensate for losses sustained through unnecessary compensation in other parts of its system.

The criterion by which the Commission should be governed in the issuance of a certificate of convenience and necessity is the "public interest" and not the convenience and necessity of any local interest.

Questions involved in this appeal can not be appraised in their proper prospective until they are isolated.

The legislature is a representative body, and it is a cross section of the public, and expresses public opinion upon matters of public policy, and it needs a technical body as an aid

in investigation of fact and in securing administration and enforcement.

While it is conclusively presumed a legislature acts only in the "public interest," the Commission, an agency of the legislature, is not protected by such presumption.

So that the Commission, being the agent of the legislature, is the representative of the *public* as distinguished from a part of the *public* and the criterion must always be the whole *public interest,* and the commission can not justify its acts upon any hypothesis except the exercising of reasonable judgment in the entire *public interest.*

Nor should competition be allowed until the commission has found also an ample return on the investment of the *competitor* is possible. The granting of the certificate of convenience and necessity resting on any other foundation is not grounded on a reasonable exercise of judgment.

For these reasons alone the commission has not regularly pursued its authority in this specific instance. If the rates of the Traction company are excessive, and its service is inadequate, the Commission has had jurisdiction and authority at all times since its creation to require the Traction company to render adequate service at reasonable rates. That is the only reason for the existence of the commission.

If we are to return to regulation by competition let the local municipalities decide it for themselves. We certainly do not need a commission to tell a local democratic municipality whether it may or may not permit competition between utilities using the streets of such municipality.

So that the commission's finding is insufficient to support its judgment in the exercise of a reasonable judgment. Either it *has not regularly pursued its authority* in *regulating* both the Traction company and its rates; or it failed to exercise a reasonable judgment in issuing its certificate of convenience and necessity, thereby approving unrestricted and ruinous competition, which is not in the *public interest,* and not only will that part of the local public directly affected by the competition suffer, but such suffering will

be passed on to the public generally who have reason to expect the highest grade of service of the existing public utility and who are not otherwise directly involved in this case, and that is the only basis upon which the commission can justify its existence.

In the development of legislative policies the initiative must be taken by the commission, since they are in close touch with the problems, that is why the commission was created.

There are those who oppose commissions because of what appeared to them to be a usurpation of legislative prerogatives. That question need not trouble us here because the battle ground upon which this issue was finally decided was the courts.

An understanding of this conflict may be observed in connection with litigation of the Interstate Commerce Commission.

Section 12 of the Interstate Commerce Act of 1887, as amended March 2, 1889, and February 10, 1891, provided in part (See, Page 15 Hamlin's Inter-State Commerce Acts, Copyright, 1907, Little, Brown & Co.) :

"* * * That the Commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created; and the commission is hereby authorized and required to execute and enforce the provisions of this act, * * * and for the purposes of this act the commission shall have power to require, by subpoena, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation."

The Interstate Commerce Commission was opposed on the theory that such legislation constituted an unlawful delegation of power. The Utah Commission possessed all of these powers.

The Interstate Commerce Commission Act quoted above was construed in the case of *Interstate Commerce Commission* v. *Brimson*, 1894, 154 U. S. 447, page 473, 14 S. Ct. 1125, 38 L. Ed. 1047, and when properly understood there is no conflict between that interpretation and the holding of this court in the Rowell case. See *Rowell et al.* v. *State Board of Agriculture*, 98 Utah 353, 99 P. 2d 1. In the Brimson case Justice Harlan quotes from Chief Justice Marshall in the case of *McCulloch* v. *Maryland*, 17 U. S. 316, 4 Wheat. 316, page 409, 4 L. E. 579, page 602.

"It is a settled principal of constitutional law that 'the government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception.' " [154 U. S. 477, 14 S. Ct. 1132, 38 L. Ed. 1047].

The constitutional validity of such legislation depends upon what duties are delegated. The distinction between what duties may or may not be delegated has been drawn upon the ground that the legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or maintains to make, its own action depend.

The distinction is cleared up further in the case of *Ruggles* v. *Collier*, 43 Mo. 353, where it was said that the legislative power implies a judgment and discretion on the part of those who exercise it, and a special confidence and trust on the part of those who confer it, and that consequently the legislative power cannot be delegated.

This gives us the distinction between a delegation of power to make a law, and the delegation of power to administer a law which has already been made. The former contemplates discretion as to what the law shall be and this may not be delegated by a legislature, while the latter contemplates the exercising of discretion in its administration,

and may be delegated. See *State* v. *Chittenden,* 127 Wis. 468, 107 N. W. 500.

These general ideas were applied in the case of *Minneapolis, St. P. & S. Ste. M. Ry. Co.* v. *Wisconsin R. R. Comm.,* 1908, 136 Wis. 146, 116 N. W. 905, 17 L. R. A., N. S., 821. See page 164 of 136 Wis., 116 N. W. 905, page 911, 17 L. R. A., N. S., 821, where the court discusses the inherent power of the legislature under the state constitution to delegate any power not legislative which it may itself rightfully exercise, and where a preliminary determination of a fact or group of facts is necessary before enforcing a law.

The gist of the opinion appears from the following extract:

"* * * If it were conceded that the commission had power of discretion to fix one of several rates, either of which would be just and reasonable, it would be hard to say that this was not a delegation of pure legislative power to the commission. But the theory of this law is to delegate to the commission the power to ascertain facts and make administrative regulations. * * *"

and, therefore it is valid.

Objection has been raised to the provisions of such laws giving the commission power to compel the attendance of testimony of witnesses and the producing of records, etc., as being usurpation of judicial power and an invasion of personal liberty. This barrier has been leveled, since it is now held that this power of a commission is merely incidental to its duty to investigate and does not constitute a delegation of pure judicial power nor an invasion of personal liberty.

The commission is a permanent administrative body whose services are continuously available for purposes of investigation, and for adjusting conflicts between public utilities and their patrons. They give to these problems their exclusive attention and soon build up in the course of their investigations and their adjustments of disputes, an apparatus of administrative working rules, and a basis of

technical facts upon which a coordinated and predictable policy of detailed control may rest.

Even if competition is permitted, the limited amount of space in the city streets will make it impossible to have more than a few motor bus lines, or other forms of transportation facilities engaged in the same branch of public utility service in the same territory.

The prevailing opinion fails to take into account that the development era of public utilities coincided with the period when the spirit of individualism was supreme in economic affairs. I refer to outstanding developments which a person of average observation must see surrounding him everywhere in the United States, which govern the principles both legal and economic, that underlie the regulation of public utilities by commissions. The Utah laws are similar to those of the average states not governed by Constitutional provisions.

Opinions have been rendered in Appellate Courts of many states covering all phases of regulations by Commissions and construing "limit appeal statutes."

Either the weight of authority as reflected by these opinions of these states, which may almost be selected at random, are all wrong or the prevailing opinion fails to comprehend that we have long since passed from the stages of economic individualism in matters affecting the regulation of Public Utilities.

This dissenting opinion is submitted in the spirit of constructive criticism. It must be apparent that in my opinion the prevailing opinion in this case is fundamentally wrong because *competition* and *regulation* are *inconsistent policies,* and that regulation of Public Utilities by the Commission is the declared public policy of this State.

Some commissions, notably California, where Public Utilities are controlled by a commission under constitutional provisions have allowed *competition* under a declared policy promulgated to give an economic interpretation to a certificate of convenience and necessity.

But the action of the California commission was based on an economic interpretation of the needs of the State. The commission taking the position that the State of California has just begun to develop, and in the major portion of the territory in which competition is permitted there is room for a larger development and, therefore, adequate business for each of the competing utilities.

The decision of the California Railroad Commission has been severely criticized. See the case of *Pacific Gas and Electric Co.* v. *Great Western Power Co.*, 1912, 1 Cal. R. R. Comm. Dec. 203.

It has been asserted that the remedy for the evils of poor service and excessive rates is not competition, which leads to duplicate investments upon which the public is pledged to pay a return. *Competition* and *regulation are inconsistent policies.*

The term "convenience and necessity" is a misnomer unless given economic interpretation by administrative commissions. Extensions may be proposed or demanded by consumers which, while convenient and necessary for one group, are an extravagant burden upon the rest of the particular community and the rest of the state.

Upon this general principle of law the case of *Railroad Comm.* v. *Shupee,* Tex. Civ. App., 57 S. W. 2d 295 is timely and analogous.

The Texas statute limits the review to the question of whether the order of the commission is "unreasonable" and "unjust."

The Utah statute limits the question *to whether the commission has regularly pursued its authority,* etc.

The Texas case is very illustrative in defining, as a matter of law, the distinction between a "public convenience" and a "public necessity" as distinguished from such a question of fact. The Texas case holds as I do in this opinion, that the court's review will determine whether the commission has regularly pursued its authority which is to say *to keep the commission within the law.* The italicized words

being the language of the Texas court. So it is seen that by construction the courts uphold the legislative policy to regulate utilities, but the prevailing opinion adopts a method of regulation by competition which has long since been discarded almost everywhere.

The term *"authority"* as used in Sec. 76-6-16, R. S. U. 1933 is used to express a derivative power.

In commenting on the definition of power the court in the case of *Martin* v. *Oregon R. & Nav. Co.*, 58 Ore. 198-203, 113 P. 16, 19, the Court quotes from the Century dictionary and defines "authority," as follows:

> " 'Authority' means power to act, whether original or delegated * * *, but the term is usually used to express a derivative power."

The power of the commission is derived from Section 76-4-1, R. S. U. 1933.

And the insertion in the statutes of the term *"whether the commission has regularly pursued its authority"* implied the legislative intention was to restrict the *authority* of the commission to the powers delegated to it by the legislature. Otherwise the public utilities would be regulated by the whims and caprices of men, instead of regulated by a system of laws, enforced through the agency of a mandatory commission composed of men.

Neither the commission nor this court has any prerogative or power to change the public policy of the state as declared by the legislature of Utah. I do not believe the commission would have issued its certificate of convenience and necessity to Airway in this case if it had been informed that *competition* and *regulation are inconsistent policies.*

This court long ago in its opinion should have given the commission a sufficiently didactic interpretation of the law so that it would know whether it *was regularly pursuing its authority.* I am mindful of the so-called excesses the utilities in the country are charged with having perpetrated, and the public clamor for adequate regulation. But we may as well meet the problem where we find it. What can it be claimed

the prevailing opinion in this case has established? Certainly it has not attempted to assist in carrying out the public policy of this state as declared by the legislature. On the contrary it has undertaken to reverse the declared legislative policy.

We are going to have utilities with us always and the law must regulate them. This court is not here to say whether that method of regulation shall be by *competition* or *regulation* by a mandatory commission. That is a legislative prerogative and not a judicial question. And the legislature has spoken. And the duty of this court is plain, but the court has failed to measure up to the duty imposed upon it.

In governmental law, the term "authority" has been defined as meaning legal power; a right to command or to act; the right and power of public officers to require obedience to their orders *lawfully* issued in the scope of their *public* duties. See, Black's Law Dictionary.

The verb to "supervise" is defined in 60 C. J. Title: "Supervision" p. 1164, and is distinguished from "regulation" in *Re James,* 97 Vt. 362, 123 A. 385. The power to *regulate* implies the power *to prescribe rules and regulations* for the conduct of the business *regulated.* (See, Title: "Regulate" Para. 3, p. 1174, also Paras. 5 and 6, subdivisions D and E, under Title: "Regulate" 53 C. J. 1175 et seq.)

The term *"regulate"* is synonymous with the power to make *"by* law," *"order," "ordinance"* and *"rule."* 53 C. J. Title: "Regulation" Para. 7, p. 1179, 1180.

Many definitions of the meaning of the term "regulation" may be found under the title "Regulation," 53 C. J. p. 1177, et seq., but I will not stop to review these definitions as the question has been passed upon by this court in the case of *Ogden City* v. *John Doe Leo,* 54 Utah 556, 182 P. 530, 531, 5 A. L. R. 960, when this court had before it the question of the construction of Sec. 570x38, Compiled Laws of 1917, which is as follows:

"\* \* \* among other things, expressly confers power upon all the cities of this state to 'license, tax and regulate \* \* \* restaurants, hotels, taverns, theaters, opera houses, music halls, boarding houses, eating houses, chop houses, lodging houses,' etc."

The statute 570x87 further authorizes all cities to pass all ordinances and rules, and make all regulations,

"not repugnant to law, necessary for carrying into effect or discharging all powers and duties conferred by this chapter, and such as are necessary and proper to provide for the safety, and preserve the health, and promote the prosperity, improve the morals, peace, and good order, comfort, and convenience of the city and the inhabitants thereof," etc.

And it was held in that case:

"\* \* \* The statute thus confers ample power upon cities to make all reasonable and proper *regulations* of the various business enterprises mentioned in the statute. \* \* \*"

Section 76-4-1 is a grant of power to the commission by the legislature to *regulate* every public utility in the state, and that statute is just as broad as Section 570x87 Compiled Laws of 1917, construed by the court in the case of *Ogden City* v. *Leo,* supra.

The statutory authority contemplates that the commission itself will be controlled by a plan based upon the "public interest" and economic condition found in the state. In formulating such a plan the commission is circumscribed only by the *public interest.*

The commission should adopt some economic interpretation so that its working rules and regulations could bring into common action a consistent and homogeneous policy upon which a coordinated, predictable and settled course of action may rest in all of its operations.

Such action is desirable and necessary as a safeguard to the public interest, for the reason that along with the legislative power to establish a virtual monopoly, the commission was given the power to compel the monopolies to serve the

public more faithfully than had been the practice before the passage of the law, and if the commission fails as it has in this case then the legislation fails and usurpation of power results.

Thus, in the case of *Re Ashmead et al.,* P. U. R. 1916D, page 10, the commission denied applications for certificate of convenience and necessity and directed the occupying street railway company to make certain designated improvements and extensions, and to reroute certain existing lines, and gave an economic interpretation of its *policy*:

"* * * It is the policy of the state of New York since the passage of the Public Service law to protect existing public utilities from unrestricted and ruinous competition and by efficient regulation to compel them to furnish a high quality of service after being permitted to earn a fair return upon the investment."

And, this brings me to the consideration of the final question in this case, which is the failure of the applicant to obtain and receive the required consent, franchise or permit from the proper county, city, municipal or other public authority as provided under subsection 3 of Section 76-4-24, R. S. U. 1933.

It is not intended by the law that the requirements of a certificate of convenience and necessity shall substitute State commission for the municipal authorities, when by either constitution or statute of the state the consent of municipality is required before the certificate of convenience and necessity shall issue.

A constitutional provision requiring consent of the local authority is a limitation on the legislative power.

Article 12, § 8 of the Constitution of Utah, is, as follows:

"* * * No law shall be passed granting the right to construct and operate a street railroad, telegraph, telephone or electric light plant within any city or incorporated town, without the consent of the local authorities who have control of the street or highway proposed to be occupied for such purposes."

Subsection 3 of Section 76-4-24, R. S. U. 1933, provides in part, as follows:

"* * * Every applicant for such a certificate shall file in the office of the commission such evidence as shall be required by the commission to show that such applicant has received the required consent, franchise or permit of the proper county, city, municipal or other public authority. * * *"

I do not intend to graft the provisions of Section 76-4-24, R. S. U. 1933, upon the provisions of Article 12, Section 8 of the Constitution of Utah, but the philosophy underlying both the statute and the constitutional provision springs from the same conception of local self-government.

The philosophy underlying Section 76-4-24, R. S. U. 1933, and Article 12, Section 8 is the same.

The state under the police power and through the Commission reserves the right to say whether the exercise by the grantee of the rights and privileges covered by a certificate of convenience and necessity will promote the public convenience and necessity of the locality in which the rights are to be exercised.

If it decides to the contrary, it has the power to withhold the necessary certificate; if it decides in the affirmative, it is its clear duty to grant the certificate but subject to the limitations it has imposed upon itself by a declaration of policy.

Such limitations as the State has imposed upon itself may be found in subsection 3 of Section 76-4-24, R. S. U. 1933, or by constitutional limitation imposed upon its legislative power.

The police power represents the heart of the problem of public utility regulation from both a legal and political point of view.

The general purpose is the regulation of utility conduct in the "public interest."

The "police power" as Dean Pound points out, is

"not a definite, specially limited and specially defined power like the

power of Congress over the interstate commerce. Indeed the significant thing in police power is not *power* but *purpose*."

So that both the framers of our Constitution and our legislature have through Section 76-4-24, R. S. U. 1933, and Article 12, Section 8 of the Constitution of Utah protected the right of local self-government of cities and incorporated towns by preserving their rights to control the burden upon their streets through withholding a franchise within the limitation of the law, and where such consent is not given a limitation is imposed upon the Public Service Commission, who can issue a certificate of convenience and necessity only where such consent has been granted under the law.

MOFFAT, C. J., having disqualified himself did not participate herein.